[Cite as *Johnson v. Ohio Dept. of Rehab. & Corr.*, 2016-Ohio-8141.]

| DANIEL JOHNSON | Case No. 2014-00768 |
| --- | --- |
| Plaintiff | Magistrate Robert Van Schoyck |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| OHIO DEPARTMENT OF REHABILITATION AND CORRECTION | |
| Defendant | |

{¶1} Plaintiff, an inmate in the custody and control of defendant, brings this action for negligence arising from an accident in which he fell from an upper bunk bed and was injured on November 18, 2013. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶2} Plaintiff testified at trial that the accident occurred while he was serving a prison term, which began in 2010, for having a weapon under disability. Plaintiff acknowledged that he previously served an 18-month term for drug possession, and that he recently returned to prison on another weapon under disability conviction.

{¶3} Plaintiff testified that in 2005, before he was ever incarcerated, he had an acute episode of swelling in his legs resulting from blood clots, and he was diagnosed at that time with deep vein thrombosis (DVT), a chronic condition. Plaintiff stated that he has taken daily prescription blood thinners ever since and he expects to remain on them for the rest of his life. Plaintiff related that he has a heightened risk of harm from cuts or bruises due to the blood thinners. Plaintiff also testified that he has type 2 diabetes.

{¶4} Plaintiff recounted that soon after entering defendant's custody in 2010, he was assigned to the Allen Correctional Institution (ACI), where he received regular care and treatment for his medical conditions, and at one point he suffered another blood clot episode for which he ended up in an outside hospital. Plaintiff stated that the medical

personnel at ACI issued him a lower bunk restriction around the time that he arrived there, and that he continued to hold such a restriction throughout the entire time he spent there; a copy of plaintiff's long-term lower bunk restriction was admitted into evidence as Plaintiff's Exhibit 1.

{¶5} Plaintiff related that defendant eventually transferred him to the Warren Correctional Institution (WCI), where he was issued another lower bunk restriction and accordingly assigned to a lower bunk in the 3A housing unit. According to plaintiff, he subsequently was ticketed for having wine in his cell, and, as a result, he was moved to the 3D housing unit, which was considered a "sanctions unit." It was plaintiff's testimony that after he reported to the 3D housing unit on October 24, 2013, he told Corrections Officer Bridget Lee about his lower bunk restriction, and she consequently made some effort to get him a lower bunk that was located in a four-man cell and was occupied at that time by an inmate who was known by the nickname "Tight White." According to plaintiff, however, when Lee went to that cell and told that inmate that she wanted him to move, the inmate became loud and argued with Lee, making clear that he did not want to move. From plaintiff's recollection, Corrections Officer James Weybright, who typically was also on duty during that shift, was not in the unit at that particular time. Plaintiff stated that Lee relented and came back to talk with him, apparently at a two-man cell where she had initially assigned him to an upper bunk when he first arrived in the unit. From plaintiff's testimony, Lee basically ordered him at that point to go ahead and take the upper bunk in that cell, so he entered the cell and nothing further happened.

{¶6} Plaintiff testified that the lower bunk in this cell was occupied at that time by an inmate that he had never met before named Luck, who also had a lower bunk restriction. Plaintiff denied telling Lee or anyone else that he was satisfied with the upper bunk, and also denied that Lee or anyone else ever asked him to sign a form

waiving his lower bunk restriction.  Plaintiff testified that after he moved into the cell he did not say anything about the matter to any staff members the rest of the day.

{¶7} Plaintiff testified initially that he did go on to complain to approximately four staff members at one time or another before the date of the accident, but they all referred him to other employees and nothing happened.  Plaintiff was cross-examined about this in detail, however, and he acknowledged that he did not talk to his unit manager nor his case manager, he never sought relief through the institutional grievance process, he never used the institutional "kite" system to write to anyone about this, and he never communicated with anyone in the medical department, where he visited at least once a day for medication and other care and treatment, and which had issued the lower bunk restriction.  Plaintiff recalled trying to say something to an unidentified corrections officer or other employee during the second shift one day, apparently about a lower bunk that plaintiff had seen opening up across the way, but that individual just kept walking past the cell.  Plaintiff also recalled another time when the warden made rounds through the unit and he asked the warden about getting a lower bunk, but the warden referred him to the unit manager or his case manager.  Plaintiff stated that the unit manager, a Ms. Battles, was "kind of mean" and apparently that is why he did not talk to her about the bunk issue.

{¶8} Plaintiff testified that in the early morning of November 18, 2013, while he was asleep atop the upper bunk, he felt himself start to roll out of bed and he tried to catch himself but was unable.  Plaintiff stated that his head struck a metal locker box when he fell, cutting his forehead near the right eye, and the rest of his body hit the concrete floor.  Plaintiff recounted that Luck alerted a corrections officer, and that when the officer asked him to get up off the floor, he had trouble standing, so the officer told him to wait until medical personnel arrived.  Plaintiff recalled that medical personnel came to the cell and took him to the medical department where he underwent an

examination. A Medical Exam Report prepared at that time by a nurse was admitted into evidence as Plaintiff's Exhibit 10.

{¶9} Corrections Officer Bridget Lee testified that at the time relevant to this case she worked as a relief officer at various posts throughout WCI, and on Thursdays she worked in the 3D housing unit. According to Lee, when plaintiff transferred into that housing unit he did not notify her that he had a lower bunk restriction, nor did she otherwise know about that. Lee stated that she assigned plaintiff to a two-man cell where his new cellmate, an inmate named Roy Luck, had a lower bunk restriction, meaning that plaintiff would have to take the upper bunk.

{¶10} Lee testified that shortly after she made this assignment, the count officer for that shift, Latonia Thomas, called and said that plaintiff had a lower bunk restriction and that plaintiff should be assigned to a lower bunk in a certain four-man cell in the same housing unit. Lee's recollection is that when she started walking over to the four-man cell to have one of the inmates there swap beds with plaintiff, plaintiff told her that he was fine and would stay put. Lee denied that there was any argument between her and any inmate from the four-man cell.

{¶11} Lee testified that it was her understanding that an inmate could waive a lower bunk restriction by signing an "against medical advice" form, and that when plaintiff told her the upper bunk was acceptable to him, she told him he would need to go to the medical department and sign one of those forms. Lee stated that when plaintiff prepared to leave the unit later that day for "pill call," a designated time when inmates can visit the medical department to receive medication, she told plaintiff to sign the form while he was there. Indeed, Lee recalled that when plaintiff returned, he told her that he had done so. Lee stated that she did not call the medical department for verification, nor did she ever see any documentation that plaintiff had signed the form. Lee made a note in the unit logbook to document plaintiff's move into the two-man cell,

but did not note anything about plaintiff waiving his lower bunk restriction. (Plaintiff's Exhibit 9.)

{¶12} According to Lee, plaintiff never said anything to her about his bed assignment after that time. Lee was certain that there were lower bunks available in the housing unit between the time plaintiff moved there and when he fell.

{¶13} Corrections Officer James Weybright testified that at the time relevant to this case he worked as a relief officer at various posts throughout WCI, and that around that time he and Lee worked the second shift together in the 3D housing unit at least once a week. Weybright stated that he has no memory of plaintiff being transferred into that housing unit, though, nor any memory of an inmate arguing with Lee around that time. Weybright testified about a corrections officer's responsibility to support his or her partner, and that if he had been aware of an inmate disrespecting Lee he would have gotten involved.

{¶14} Latonia Thomas testified that at the time relevant to this case she worked as the second shift count officer at WCI, meaning that she was responsible for tracking inmate movement in and out of the institution, as well as the inmates' placement and bed assignments within the institution. Thomas recalled being involved with plaintiff's move into the 3D housing unit, explaining that she received a call from a Lieutenant Tally with the Rules Infraction Board (RIB), notifying her that plaintiff was being disciplined and needed to be moved to that housing unit, which was set aside for inmates under disciplinary sanctions. Thomas stated that she consequently made arrangements for plaintiff to be transferred to that unit and she identified a two-man cell for him in which an upper bunk was available. As Thomas described, there was a chart in the count office to track inmates' bed assignments, and there were stickers denoting inmates with lower bunk restrictions. Thomas acknowledged that initially she failed to notice that plaintiff had a lower bunk restriction.

{¶15} According to Thomas, after plaintiff had gone to the 3D housing unit and been placed by Lee in the upper bunk of the two-man cell, Lee made her aware over the phone that plaintiff had a lower bunk restriction. Thomas testified that there were no lower bunks available in the 3D housing unit at that time, so she told Lee to go to one of the transitional four-man cells, none of which were occupied by inmates with lower bunk restrictions, and swap out any one of the inmates there. Thomas specifically remembered from the phone call, however, that none of the inmates in those four-man cells wanted to move because they did not want to share a cell with inmate Luck, and it was at that point when plaintiff told Lee that he preferred to remain in the two-man cell.

{¶16} Thomas related that an inmate with a lower bunk restriction was permitted to occupy an upper bunk only on the condition that he go to the medical department and sign an "against medical advice" form to voluntarily waive the restriction. According to Thomas, the practice was that the medical department would forward a copy of the signed form to the count office within a few days. Thomas recalled from the phone conversation that Lee told her plaintiff was going to go to the medical department and sign one of those forms. But, Thomas testified that she was not aware of the count office ever receiving a copy of any such form for plaintiff from the medical department.

{¶17} Thomas stated that if plaintiff had insisted on having his lower bunk restriction honored, for her part she would have found a way to make it work. Thomas also stated that she was sure there were lower bunks that became available in the 3D housing unit during the ensuing time in which plaintiff lived there.

{¶18} Corrections Officer Brant Kendrick testified that at the time relevant to this case he worked as a relief officer at various posts throughout WCI. Kendrick recalled that a little after midnight on November 18, 2013, while he made rounds through the 3D housing unit, he heard plaintiff's cellmate knock on the door of their cell. Kendrick testified that the cellmate advised him that plaintiff had fallen, and when he looked inside he observed plaintiff lying on the floor. When he asked plaintiff whether he was

okay, Kendrick stated, plaintiff told him no.  Kendrick also recalled seeing a red mark on plaintiff's face.   Kendrick testified that he contacted a supervisor who, in turn, summoned medical personnel.   Kendrick stated that he waited at the cell for approximately three to four minutes before one of the medical staff members arrived and took plaintiff to the infirmary.  According to Kendrick, he never had any contact with plaintiff prior to this incident, but he noted that he worked the third shift, when inmates are typically asleep.

{¶19} Kimberly Mockabee testified that she is employed with defendant as the institutional inspector at WCI, and that her duties include investigating inmate grievances, among other things.  Mockabee stated that she initiated an investigation upon receiving a grievance that plaintiff submitted after the accident, and ultimately she found that plaintiff had a valid lower bunk restriction and thus under defendant's policy he should have been assigned a lower bunk.  As part of her investigation, Mockabee recalled, she at least spoke with Thomas and the acting health care administrator for WCI.   Mockabee testified that when she finished her investigation she prepared a Disposition of Grievance form, as well as a separate report to the warden which she prepared due to the fact that she was making a recommendation.  (Plaintiff's Exhibit 7, 8.)

{¶20} "To establish negligence, a plaintiff must show the existence of a duty, a breach of that duty, and injury resulting proximately therefrom."  *Taylor v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 11AP-1156, 2012-Ohio-4792, ¶ 15.   "In the context of a custodial relationship between the state and its prisoners, the state owes a common law duty of reasonable care and protection from unreasonable risks."  *Rose v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 04AP-1360, 2005-Ohio-3935, ¶ 9. "The state, however, is not an insurer of inmate safety and owes the duty of ordinary care only to inmates who are foreseeably at risk."  *Franks v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 12AP-442, 2013-Ohio-1519, ¶ 17.  "Reasonable care is

that degree of caution and foresight an ordinarily prudent person would employ in similar circumstances, and includes the duty to exercise reasonable care to prevent an inmate from being injured by a dangerous condition about which the state knows or should know." *McElfresh v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 04AP-177, 2004-Ohio-5545, ¶ 16. "Prisoners, however, are also required to use reasonable care to ensure their own safety." *Nott v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 09AP-842, 2010-Ohio-1588, ¶ 8.

**{¶21}** Upon consideration of the evidence presented at trial, the magistrate makes the following findings. Plaintiff's medical issues made it foreseeable that if he was assigned to an upper bunk and fell out, he could seriously injure himself, and for that reason the medical personnel at the institutions where he was incarcerated exercised their professional judgment and issued him long-term lower bunk restrictions that remained in effect throughout his time in custody.

**{¶22}** On October 24, 2013, the RIB imposed a disciplinary sanction on plaintiff by ordering that he be moved to the 3D housing unit for six months. When Count Officer Thomas received notification of the RIB's decision, she failed to take notice of plaintiff's lower bunk restriction and she identified an upper bunk for him in a two-man cell, which he would share with inmate Luck. When plaintiff arrived at the 3D housing unit, Corrections Officer Lee told him to take the upper bunk that Thomas had identified. Plaintiff told Lee that he had a lower bunk restriction, and this was confirmed to Lee over the phone by Thomas. As a result, Lee went to a four-man cell in the unit and asked an inmate known by the nickname Tight White, who occupied one of the lower bunks, to move to the upper bunk in the two-man cell with inmate Luck. Lee's partner, Corrections Officer Weybright, was on duty but was not in the vicinity. The inmate known as Tight White argued with Lee and it was clear to plaintiff that the inmate did not wish to share a cell with inmate Luck. Indeed, Thomas's testimony established that

none of the other inmates occupying the lower bunks were agreeable to such a move, in particular because they did not want to live with inmate Luck.

{¶23} The evidence tends to show that Lee merely asked inmates occupying lower bunks to move rather than simply giving one of them a direct order to move and insisting that they comply. It should not have been up for debate. Plaintiff was put in a difficult position of either demanding over the vocal objections of other inmates that one of them be moved and thereby putting himself at odds with them, or remaining with the upper bunk to which he had already been assigned. Under those circumstances, plaintiff foreseeably could have faced negative consequences either way. Whether or not Lee specifically ordered plaintiff to take the upper bunk, it is apparent that they had some discussion after Lee failed to secure a lower bunk, and it appears that it resulted in plaintiff tacitly accepting the upper bunk placement and diffusing any tension with the other inmates. Contrary to defendant's arguments, however, plaintiff cannot be said to have freely chosen an upper bunk and assumed all risk, nor did he waive his right to a lower bunk. Plaintiff also made some effort to try to obtain a lower bunk at a later date, consistent with the fact that he had not chosen to waive his lower bunk restriction.

{¶24} Defendant had a duty to provide plaintiff a lower bunk, as stated earlier, and the evidence shows that defendant breached that duty. Defendant not only failed to honor plaintiff's lower bunk restriction at the time he was reassigned to the 3D housing unit, or to at least promptly order another inmate to move as soon as the error was discovered in a way that would not have pitted plaintiff against another inmate, but defendant also failed to correct the error at any time before the accident even though there were lower bunks that became available during that time. Plaintiff's lower bunk restriction remained in effect at all times, and even though the count office knew or should have known about this it took no action to address plaintiff's continued upper bunk assignment.

{¶25} Plaintiff, however, also failed to exercise reasonable care for his own well-being by not making a sufficient effort to try and obtain a lower bunk, despite more than three weeks passing before the accident and the fact that he knew lower bunks were coming available during that time. For certain, plaintiff did notify Lee of his lower bunk restriction as soon as this matter arose. And, plaintiff's testimony that he mentioned the problem to the warden at some later date was credible, but plaintiff did not follow through on the warden's instruction to speak with the unit manager or the case manager. Plaintiff had the ability to contact the unit manager and the case manager, and he actually did so regarding another issue around that time, but he failed to raise the bunk issue with them. It is apparent, particularly from plaintiff's testimony on cross-examination, that he cannot recall with any specificity who else he may have spoken with. It seems that plaintiff at least attempted to speak with a corrections officer or some other employee through the door of his cell during the second shift one day but the employee kept walking by, although it is not clear whether that person even heard plaintiff in the first place. It is clear that plaintiff did not attempt to communicate with any staff members through the institutional kite system, nor did he file any complaint through the grievance system prior to the accident.

{¶26} Early on the morning of November 18, 2013, plaintiff had been asleep and suddenly felt himself start to roll out of bed. Plaintiff tried to catch himself but was unable. Plaintiff's forehead struck a metal box and the rest of his body hit the concrete floor. As a result, plaintiff suffered injuries as a natural and probable consequence of both parties' negligence. The precise nature and extent of plaintiff's injuries are to be addressed during the damages phase of this bifurcated proceeding.

{¶27} Based upon the foregoing, and weighing plaintiff's comparative negligence against that of defendant, the magistrate finds that plaintiff has proven his claim of negligence by a preponderance of the evidence. It is recommended that judgment be

entered in favor of plaintiff, with a 25 percent diminishment in any award for compensatory damages.

{¶28} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

ROBERT VAN SCHOYCK
Magistrate

cc:

Richard F. Swope
6480 East Main Street, Suite 102
Reynoldsburg, Ohio 43068

Christopher L. Bagi
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

**Filed November 3, 2016**
**Sent to S.C. Reporter 12/15/16**